**UNITED STATES of America, Appellee,**

v.

**Lawrence David RAMAPURAM,
Appellant.**

**No. 79–5051.**

United States Court of Appeals,
Fourth Circuit.

Argued July 8, 1980.

Decided Oct. 9, 1980.

Benjamin Lipsitz, Baltimore, Md., for appellant.

Herbert Better, Asst. U.S. Atty., Baltimore, Md., (Russell T. Baker, Jr., U.S. Atty., Baltimore, Md., on brief), for appellee.

Before BUTZNER, MURNAGHAN and ERVIN, Circuit Judges.

MURNAGHAN, Circuit Judge:

A jury convicted Lawrence David Ramapuram under a one count indictment for violating 18 U.S.C. § 842(h).[1] The charge arose from a theft from a cemetery bunker of fifty pounds of dynamite. The principal issue raised on appeal is whether the district court erred in overruling Ramapuram's motion to suppress evidence allegedly obtained in violation of the Fourth Amendment prohibition of unreasonable searches and seizures.[2] Ramapuram also seeks reversal on the grounds that the district court erred in its instructions to the jury and in concluding that it had jurisdiction over the case.

### I.

### A.

Ramapuram, who was seventeen years old at the time,[3] together with a sixteen

---

1. 18 U.S.C. § 842(h) provides:

 It shall be unlawful for any person to receive, conceal, transport, ship, store, barter, sell, or dispose of any explosive materials knowing or having reasonable cause to believe that such explosive materials were stolen.

2. The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

3. On January 14, 1976, Ramapuram was arrested and charged by information with an act of juvenile delinquency pursuant to 18 U.S.C. § 5031 *et seq.* On February 11, 1976, with the aim of prosecuting Ramapuram as an adult, the United States moved the district court pursuant to 18 U.S.C. § 5032 to transfer the proceedings to its criminal docket. Prior to any action by the district court on the transfer request, the parties entered into a deferred prosecution agreement which provided for, *inter alia*, inpa-

year old associate, Fisher, whose assistance Ramapuram sought and obtained, broke into the concrete cemetery bunker and removed the dynamite (approximately 100 sticks) on December 16, 1975. Cemetery employees discovered the theft a week later, on December 23, 1975, and reported the same to the Bureau of Alcohol, Tobacco and Firearms on December 24, 1975. Agent McMonagle of the ATF began an immediate investigation. The Maryland State Police also investigated the theft.

Recovery of most of the dynamite and Ramapuram's subsequent arrest resulted from a warrantless search and seizure which occurred under the following circumstances. Agent McMonagle received a report on New Year's Eve at or about 3:30 p. m. from a state police detective, Tenny, that Ramapuram and Fisher were responsible for the theft. Tenny received his information from his son, an acquaintance of Ramapuram and of Fisher, who was present near the cemetery on the night of the theft and who, in fact, had observed, with others, Ramapuram and Fisher load the dynamite into Ramapuram's automobile. Detective Tenny also advised McMonagle that, according to the former's son, Ramapuram had expressed the intention to blow up certain public buildings. Later, on December 31, 1975, McMonagle learned that Fisher was in the custody of the Maryland State Police. McMonagle proceeded to the location where Fisher was being held and interviewed him. Sometime between 5:00 p. m. and 6:00 p. m.

on the same day, December 31, 1975, Fisher told McMonagle that the dynamite was in the trunk of a Chevrolet automobile which was parked in a field on a farm located in Baltimore County, Maryland, and owned by Ramapuram's father, a medical practitioner. McMonagle, accompanied by another ATF agent and two state police troopers,[4] first went to the Ramapuram home to talk to Ramapuram's father, who, however, was not there. They then proceeded directly to the farm, arriving at or about 6:30 p. m.[5]

It was raining and dark as the vehicle containing the agents and troopers left the public road and entered the farm along a narrow private road. The vehicle advanced approximately two hundred yards from the public road whereupon it became mired in the mud. The district court found that the members of McMonagle's party:

> left their car and approached a Chevrolet automobile parked in an open area near a fenced paddock at a distance of 150 to 200 feet from the main road.

> The Agent observed that the car appeared to have been abandoned, that the license plates had expired, the doors were unlocked, and the trunk lock had been removed. The Agent opened the trunk of the car and found that it contained 88 sticks of dynamite which according to the 'date/shift code' was [sic] part of the dynamite stolen from Woodlawn Cemetery. The officers removed the dynamite from the premises and thereafter turned it over to military personnel to be taken

tient, and ultimately, outpatient psychiatric treatment for Ramapuram.

Upon Ramapuram's breach of several of the conditions contained in the deferred prosecution agreement, e. g., his admitted involvement in several violations of state law, including armed robbery, the government decided to pursue its § 5032 motion. After hearing, the district court granted the requested transfer and the trial on the subsequent indictment is that from which this appeal was noted. *See United States v. Ramapuram*, 432 F.Supp. 140 (D.Md. 1977), *aff'd*, 577 F.2d 738 (4th Cir.) (unpublished opinion), *cert. denied*, 439 U.S. 926, 99 S.Ct. 309, 58 L.Ed.2d 318 (1978). Ramapuram's jurisdictional attack on his conviction is founded on the alleged impropriety and inadequacy of the § 5032 transfer certification and on the then-pending appellate proceedings

arising therefrom. It is urged that the then-pending appellate proceedings ousted the district court's jurisdiction in this case.

4. At the suppression hearing McMonagle stated he was accompanied by two state police troopers. At trial, on cross-examination, he stated that a second ATF agent was also in the car.

5. There are contradictory indications in the record as to whether the visit to the Ramapuram residence preceded or followed the interview with Fisher. Whichever the case, our conclusion as to the pertinent legal questions would remain the same. It appears inescapable from the evidence that the visit to the Ramapuram residence occurred after the Fisher interview.

to Edgewood Arsenal. The Chevrolet from which the dynamite was removed was titled in the name of the defendant's father but had been owned for the use of the defendant. Patarama Farm on which the Chevrolet was parked was owned by the defendant's father and the father's former wife. Neither the defendant nor his father lived on the farm but both had access to it and used it on occasion.

Dr. Ramapuram testified at the suppression hearing as well as at trial that the fifteen acre farm was used primarily to board and ride horses, by members of the Ramapuram family and others. At trial, he testified that the lone residence located on the farm was under lease to unspecified tenants. The 1964 Chevrolet automobile from which the dynamite was seized was described by the district court based on photos which are a part of the record as a "junker;" it was not the automobile driven by Ramapuram on the night of the theft.[6] Dr. Ramapuram testified that although the "junker" was titled in his name it had been held for use by and used by his son. Dr. Ramapuram could not remember when the "junker" was taken out of service and left on the farm. As the district court found, the "junker" had no current state license tags, the trunk lock assembly had been removed and the doors were unlocked.

It is undisputed that no search warrant was obtained and, indeed, that no effort whatsoever was made to determine the availability of a judge or magistrate to whom application could be made for such warrant. Likewise, it is apparently undisputed, as counsel for Ramapuram conceded

at argument, that ample probable cause existed to support a search warrant for the "junker" after the McMonagle–Fisher interview.

At trial, aerial photographs of the pertinent area of the farm, close–up photographs of the "junker" and of the dynamite in the trunk, and McMonagle's testimony concerning the seizure were admitted. Additionally, findings from a chemical analysis of the recovered dynamite and testimony concerning the controlled detonation of the dynamite were admitted.

Over government opposition, the district court concluded that (a) Ramapuram had standing to raise the Fourth Amendment contention; and (b) Ramapuram possessed a reasonable expectation of privacy as to matters stored in the trunk of the "junker". The district court, nevertheless, concluded that the warrantless search of the trunk of the "junker" was justified by exigent circumstances. The district court relied on several cases involving warrantless searches or seizures of explosives and weapons in varying circumstances.[7] There are, however, cases concluding that prosecutorial assertions of exigency were insufficient to excuse compliance with the warrant requirement.[8]

Which of the two lines of cases to follow is a far from easy question to resolve. Nothing in the record sufficiently established a high volatility and grave potential of explosion for the dynamite abstracted from the cemetery bunker. Exigency is urged on the idea that, with approximately 100 sticks of dynamite actually in Ramapu-

6. A search of the automobile used to transport the dynamite was undertaken pursuant to a warrant some weeks after the December 31, 1975 search of the "junker."

7. *United States v. Johnson*, 467 F.2d 630, 639 (2d Cir. 1972), *cert. denied*, 413 U.S. 920, 93 S.Ct. 3069, 37 L.Ed.2d 1042 (1973) (sawed–off shotgun left in a suitcase in high crime area); *United States v. McKinney*, 477 F.2d 1184, 1186 (D.C. Cir. 1973) (shotgun in hotel room); *United States v. Melville*, 309 F.Supp. 829, 831 (S.D.N.Y. 1970) (search of apartment for explosives possibly set to detonate). See also the recent decision of this Court in *United States v. Hensler*, 625 F.2d 1141 (4th Cir. 1980) (No.

79-5098, filed July 23, 1980) (marijuana in a grounded vessel).

In *United States v. Hendrix*, 595 F.2d 883, 886 (D.C.Cir. 1979) (per curiam) exigency was held to exist because the contraband (a shotgun) was threatened with imminent removal.

8. *See, e. g., United States v. Bradley*, 571 F.2d 787, 790 (4th Cir. 1978) (six hour delay in conducting search inconsistent with exigency claim); *United States v. Presler*, 610 F.2d 1206, 1214 (4th Cir. 1979) ("The officers had actual possession of the briefcase and should not have opened it without a warrant.").

ram's possession, his threats to blow up public buildings made the urgency of a concentrated manhunt very great. However, if it could be established that the dynamite was in the "junker" and, therefore, shielded from Ramapuram by the presence of law enforcement officers, the exigency of the search for him was reduced and might proceed more routinely.

In view of the existence of a more direct and established ground which validates the warrantless search and seizure, we expressly refrain from deciding whether such "exigency once removed" sufficed to render unnecessary a warrant in the present case. We note that *United States v. McKinney*, 477 F.2d 1184, 1186 (D.C. Cir. 1973), involved "a sawed–off shotgun, an ominous threat in and [of] itself." However, in the present case, the dynamite's risk is not simply inherent, but would depend on the particular destructive intent of Ramapuram. *Cf. Mincey v. Arizona*, 437 U.S. 385, 394, 98 S.Ct. 2408, 2415, 57 L.Ed.2d 290 (1978) ("We decline to hold that the seriousness of the offense under investigation itself creates exigent circumstances of the kind that under the Fourth Amendment justify a warrantless search.").

 The alternate ground is our conclusion that Ramapuram had no *reasonable* expectation of privacy. While warrantless searches and seizures are presumptively unreasonable under the Fourth Amendment, *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967), the thrust of the Fourth Amendment simply does not extend to locations lacking a foundation for reasonably expecting that the materials will be accorded privacy. Exploration by the government although without a warrant of non–private places does not compel the suppression of evidence so obtained. *Rakas v. Illinois*, 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978); *id.* at 150–56, 99 S.Ct. at 434 (Powell, J., concurring); *Rawlings v. Kentucky*, ——

U.S. ——, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980).

### B.

In *Patler v. Slayton*, 503 F.2d 472, 477–78 (4th Cir. 1974), a federal habeas corpus attack on a state murder conviction,[9] one issue raised on appeal was the alleged impropriety under the Fourth Amendment of a search of a pasture located on a farm owned by Patler's father–in–law and the seizure therefrom of several spent bullets and shell casings matching the murder weapon. The district court held that in the absence of a reasonable expectation of privacy Patler had no standing and, therefore, could not raise the Fourth Amendment issue on federal habeas corpus. On appeal, this court disagreed with the lower court's determination that Patler lacked standing, relying on *United States v. Cobb*, 432 F.2d 716 (4th Cir. 1970), and *Brown v. United States*, 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973). We held, however, that Patler "failed to demonstrate a reasonable expectation of privacy in the property actually searched" and that, therefore, no violation of the Fourth Amendment had been made out. Subsequent teachings from the Supreme Court have clarified that in *Patler* both the lack–of–standing approach of the district court and the no–reasonable–expectation approach of the court of appeals were correct, and both sufficed as reasons for a denial of habeas corpus. This is so because, under *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), and *Rawlings v. Kentucky*, —— U.S. ——, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980), "the two inquiries [of standing and of substantive Fourth Amendment protection] merge into one: whether governmental officials violated any legitimate expectation of privacy ...." *Rawlings v. Kentucky*, —— U.S. at ——, 100 S.Ct. at 2562. The *Rawlings* court might well have been speaking of *Patler* in stating "Prior to *Rakas*, petitioner might have been given 'standing' in such a

---

**9.** The decision by this court in *Patler* preceded the Supreme Court opinion in *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), which substantially reduced the federal courts' power to adjudicate Fourth Amendment claims of state prisoners on federal habeas corpus.

case to challenge a 'search' that netted [the evidence] but probably would have lost his claim on the merits." *Id. See United States v. Jackson*, 585 F.2d 653, 660 (4th Cir. 1978) ("[W]ithout an [expectation of privacy] [defendant] had neither standing nor a right to complaint.").

As we perceive the relevant principles, it devolves upon one seeking suppression of incriminating evidence to establish as a threshhold matter the existence of a reasonable expectation of privacy in the area searched. *United States v. Torch*, 609 F.2d 1088, 1091 (4th Cir. 1979) ("The test for whether a person may have evidence obtained in an unlawful search and seizure suppressed is whether the person had 'a reasonable expectation of freedom from government intrusion in the invaded place'."). In many cases such a showing will be readily achieved. *Arkansas v. Sanders*, 442 U.S. 753, 762, 99 S.Ct. 2586, 2592, 61 L.Ed.2d 235 (1979) ("[L]uggage is a common repository for one's personal effects, and therefore is inevitably associated with the expectation of privacy."); *United States v. Presler*, 610 F.2d 1206, 1213–14 (4th Cir. 1979) ("The very act of locking them and retaining either the key or the combination to the locks on the two briefcases was an effective expression of the defendant's expectation of privacy."). In other cases, it will be all but impossible to demonstrate a reasonable expectation of privacy, even where the movant is the owner of the property searched. *United States v. Dall*, 608 F.2d 910, 914 (1st Cir. 1979), *cert. denied*, 445 U.S. 918, 100 S.Ct. 1280, 63 L.Ed.2d 603 (1980) ("Ownership alone is not enough to establish a reasonable and legitimate expectation of privacy. Ownership is relevant to the inquiry . . . , but the total circumstances determine whether the one challenging the search has a reasonable and legitimate expectation of privacy in the locus of the search."); *United States v. Rios*, 611 F.2d 1335, 1345 (10th Cir. 1979).

"What is a reasonable expectation of privacy is by definition related to time, place and circumstance." *United States v. Vicknair*, 610 F.2d 372, 380 (5th Cir. 1980). Considerable guidance is afforded by several Supreme Court cases. In short:

the application of the Fourth Amendment depends on whether the person invoking its protection can claim a "justifiable," a "reasonable," or a "legitimate expectation of privacy" that has been invaded by government action. *E. g., Rakas v. Illinois*, 439 U.S. 128, 143, and n.12, 99 S.Ct. 421, 430 & n.12, 58 L.Ed.2d 387 (1978); *id.*, at 150, 151, 99 S.Ct. at 434 (concurring opinion); *id.*, at 164, 99 S.Ct. at 441 (dissenting opinion); *United States v. Chadwick*, 433 U.S. 1, 7, 97 S.Ct. 2476, 2481, 53 L.Ed.2d 538 (1977); *United States v. Miller*, 425 U.S. 435, 442, 96 S.Ct. 1619, 1623, 48 L.Ed.2d 71 (1976); *United States v. Dionisio*, 410 U.S. 1, 14, 93 S.Ct. 764, 771, 35 L.Ed.2d 67 (1973); *Couch v. United States*, 409 U.S. 322, 335–336, 93 S.Ct. 611, 619, 34 L.Ed.2d 548 (1973); *United States v. White*, 401 U.S. 745, 753, 91 S.Ct. 1122, 1126, 28 L.Ed.2d 453 (1971) (plurality opinion); *Mancusi v. DeForte*, 392 U.S. 364, 368, 88 S.Ct. 2120, 2123, 20 L.Ed.2d 1154 (1968); *Terry v. Ohio*, 392 U.S. 1, 9, 88 S.Ct. 1868, 1873, 20 L.Ed.2d 889 (1968). This inquiry, as Mr. Justice Harlan aptly noted in his *Katz* concurrence, normally embraces two discrete questions. The first is whether the individual, by his conduct, has "exhibited an actual (subjective) expectation of privacy," 389 U.S., at 361, 88 S.Ct. at 516— whether, in the words of the *Katz* majority, the individual has shown that "he seeks to preserve [something] as private." *Id.*, at 351, 88 S.Ct. at 511. The second question is whether the individual's subjective expectation of privacy is "one that society is prepared to recognize as 'reasonable,'" *id.*, at 361, 88 S.Ct., at 516— whether, in the words of the *Katz* majority, the individual's expectation, viewed objectively, is "justifiable" under the circumstances. *Id.*, at 353, 88 S.Ct. at 512. See *Rakas v. Illinois*, 439 U.S., at 143–144, n.12, 99 S.Ct. at 430, n.12; *id.*, at 151, 99 S.Ct. at 434 (concurring opinion); *United States v. White*, 401 U.S., at 752, 91 S.Ct., at 1126 (plurality opinion).

*Smith v. Maryland*, 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979) (footnote omitted).

### C.

At the outset, we agree with the Court of Appeals for the Fifth Circuit that a lower court's determination that a reasonable expectation of privacy does or does not exist "is a legal conclusion involving substantive Fourth Amendment analysis ... subject to full review by this court." *United States v. Vicknair*, 610 F.2d 372, 379 (5th Cir. 1980). Accordingly, the district court's statement that "[O]ne normally has a justifiable expectation of privacy in the trunk of one's car, no matter where it is parked," is not insulated by the clearly erroneous standard of review. Underlying facts supportive of the district court's legal conclusion are, of course, so insulated.

We assume that Ramapuram had an actual subjective expectation of privacy in the trunk of the "junker." He firmly desired to keep secret any item placed there, particularly the dynamite.

We do not conclude, however, that Ramapuram's actual expectation of privacy was legitimate or reasonable or justifiable. First, the district court found and concluded that the "junker" was located in an open field. *See Hester v. United States*, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924); *Johnson v. United States*, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948); *United States v. Brown*, 487 F.2d 208 (4th Cir. 1973) (per curiam), *cert. denied*, 416 U.S. 909, 94 S.Ct. 1617, 40 L.Ed.2d 114 (1974). Under the doctrine of *Hester*, no Fourth Amendment protection extends to open fields. Accordingly, for example, if the object of McMonagle's search had been the "junker" itself, rather than the contents of the "junker's" trunk, then Ramapuram clearly would not be heard to complain of the trespass by McMonagle to ascertain the identity of an auto immobilized where the "junker" was immobilized. Counsel for Ramapuram has

concentrated his argument on the difference between the altogether visible exterior of the "junker" and the concealed interior of the trunk. His position encompasses the point that the dynamite was enclosed in the "junker" itself rather than left uncovered in high grass or in a tree, *cf. Patler v. Slayton*, 353 F.Supp. 376, 383 (E.D.Va.1973), *aff'd* 503 F.2d 472 (4th Cir. 1974). The thrust of counsel's argument is that the covered, closed character of the junker's trunk foreclosed any right to open it. The district court agreed. *See also United States v. Diaz–Segovia*, 457 F.Supp. 260, 268–70 (D.Md.1978). *But see Cady v. Dombrowski*, 413 U.S. 433, 449–50, 93 S.Ct. 2523, 2531, 37 L.Ed.2d 706 (1973) (specifically leaving the question open as to back seat of automobile in open field). It is sufficient here to observe that whatever expectation of privacy attends a closed but unsecured "effect" generally is diminished where the "effect" itself is placed in an area totally without the protection of the Fourth Amendment such as in an open field. *United States v. Jackson*, 585 F.2d 653, 658–59 (4th Cir. 1978). *See United States v. Williams*, 581 F.2d 451, 453 (5th Cir. 1978), *cert. denied*, 440 U.S. 972, 99 S.Ct. 1537, 59 L.Ed.2d 789 (1979) ("Although the expectations of privacy test has done away with outmoded property concepts no longer satisfactory for fourth amendment analysis ... the distinction between open fields and curtilage is still helpful in determining the existence or not of reasonable privacy expectations."); *cf. United States v. Alewelt*, 532 F.2d 1165, 1168 (7th Cir.), *cert. denied*, 429 U.S. 840, 97 S.Ct. 114, 50 L.Ed.2d 109 (1976) (privacy expectations as to the pockets of a jacket diminished where jacket left on coat rack in "general work area").

Second, although we agree with the district court that the "automobile exception" is inapplicable to this case,[10] nevertheless, we cannot ignore the fact that it was an automobile that was searched. Courts have

---

**10.** There is no reason to treat this as an automobile case justifying the warrantless search of the "junker." *Cf. United States v. Newbourn*, 600 F.2d 452 (4th Cir. 1979). The "junker" was

not functioning as a vehicle capable of *transporting* people or property. The government does not challenge that aspect of the district court's holding.

long recognized the lessened expectation of privacy attendant to an automobile. *Cf. United States v. Newbourn*, 600 F.2d 452, 454, 457–58 (4th Cir. 1979); *United States v. Torch*, 609 F.2d 1088, 1091 n.3 (4th Cir. 1979). Accordingly, we decide on the basis of the actual characteristics of the container before us, and not on the basis of different kinds of containers which may present themselves in other cases.[11] Nor need we determine whether the automobile was abandoned in any constitutional sense. *But see United States v. Wilson*, 472 F.2d 901, 902 (9th Cir. 1972).

Third, despite Ramapuram's general rights of dominion over his own property, the question is not thereby answered. It remains a question of whether, regardless of the state of ownership,[12] he had a reasonable expectation of privacy. *Rawlings v. Kentucky*, —— U.S. ——, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980). Ramapuram failed to secure the trunk of the "junker" and, indeed, could not have done so in the normal manner by locking it inasmuch as the lock assembly had been earlier removed. "The character of the invaded place is clearly important." *United States v. Torch*, 609 F.2d at 1091 n.3. Ramapuram did not live on the farm where the "junker" was located; accordingly, however much such a factor might augment the abstract right to exclude, such augmentation is not present here. *Cf. Torch*, 609 F.2d at 1091 (Absence at the time of the search diminished the strength of an expectation of privacy). The residence on the farm was leased to others. Additionally, the farm was used with permission by persons who were neither members of the Ramapuram family nor residents on the farm. It is, of course, true that a sharing of premises does not by itself dissipate the reasonable expectations of privacy of those with joint control over the premises.[13] Here however, Ramapuram's

possessory interest in the farm and "junker" was sufficiently lessened to compel the judgment that he could not legitimately expect that the contents of the unlocked trunk of the "junker" situated in an open field would remain secure from prying eyes, irrespective of whether those eyes were private or governmental. *Cf. United States v. Vicknair*, 610 F.2d at 380.

As to the stolen dynamite, Ramapuram did not take "precautions customarily taken by those seeking privacy." *Rakas v. Illinois*, 439 U.S. at 152–53, 99 S.Ct. at 435 (Powell, J., concurring). No testimony established that the "junker" was used by Ramapuram or members of his family for storage of personal effects or any other significant purpose. *Cf. United States v. Basile*, 569 F.2d 1053, 1059 (9th Cir. 1978) (Hufstedler, J., dissenting). Neither Ramapuram's possessory interests nor his correlative but unadorned right as the owner to exclude others, under the circumstances of this case, are sufficient to raise his actual expectations of privacy to a level of constitutional legitimacy. *See United States v. Vicknair*, 610 F.2d at 381.

Taking the above considerations in combination, and whether the conclusion is cast in terms of Ramapuram's standing or on the basis that McMonagle's lifting of the trunk lid of the "junker" and his perusal of its contents did not constitute a "search" within the contemplation of the Fourth Amendment, it suffices to hold that no privacy interest protected by the Fourth Amendment was invaded and that therefore no proper case for the application of the exclusionary rule has been made out.

## II.

■ Ramapuram asserts error in the trial court's refusal to instruct the jury as to the

---

11. [A]s the Supreme Court has recognized, evidence properly obtained in one case should not be excluded as a protest against the ever present possibility of abuse of evidence gathering techniques in another, hypothetical, case.
*United States v. Vasquez*, 612 F.2d 1338, 1346 (2d Cir. 1979).

12. Legal title to the "junker" was in Ramapuram's father. Still it was acquired for use by the son, and we regard him as the owner for the purposes of this discussion.

13. *Mancusi v. DeForte*, 392 U.S. 364, 369, 88 S.Ct. 2120, 2124, 20 L.Ed.2d 1154 (1968).

meaning of the word "substantial" in its instructions on the insanity defense and in the court's like refusal to instruct the jury that "criminality" of conduct in the federal insanity test means moral rather than criminal wrongfulness. Counsel, at oral argument, having, we think, sensibly withdrawn from our consideration the latter issue, we determine that the former is also lacking in merit. Language is by its very nature an approximation. In any search for absolutism in conveyance of a meaning, each addition of words by way of definition of words already employed only invites demand for further clarification of additional words introduced as part of the definition.

Of course, a demand for specificity where words employed are inherently unclear or ambiguous, may well be justified. However, reading the district court's charge in its entirety demonstrates that the trial judge made readily comprehensible to the jury what the significance was of the words utilized: "substantial capacity." There is no showing here that the jury failed to understand or properly to apply the trial court's insanity charge. *See United States v. Butler,* 409 F.2d 1261 (4th Cir. 1969).

### III.

In *United States v. Ramapuram,* 432 F.Supp. 140 (D.Md.1977), *aff'd,* 577 F.2d 738 (4th Cir.) (unreported), *cert. denied,* 439 U.S. 962, 99 S.Ct. 309, 58 L.Ed.2d 318 (1978), we affirmed the district court's holding that the government timely filed its second certification, pursuant to 18 U.S.C. § 5032, to the effect that the state juvenile court refused to assume jurisdiction over the case against Ramapuram. We have no occasion to reexamine that decision.

Finally, we think the contention that the pendency of the appellate proceedings in the juvenile case ousted the district court's jurisdiction under the instant indictment lacks merit. They were separate and distinct proceedings.

*AFFIRMED.*

ERVIN, Circuit Judge, dissenting:

I respectfully dissent because I believe that the majority erred in failing to grant Ramapuram's motion to suppress evidence allegedly seized in violation of the Fourth Amendment. The Fourth Amendment prohibits unreasonable searches and seizures of "persons, houses, papers, and effects." It is undisputed that the recovery of most of the dynamite resulted from a warrantless search and seizure by state and federal law enforcement officers.

In order to protect the privacy of a citizen against arbitrary invasions by government officials, the Supreme Court has expressed a strong preference that law enforcement officers secure search warrants prior to searching private property. *See, e. g., Camara v. Municipal Court,* 387 U.S. 523, 528–29, 87 S.Ct. 1727, 1730, 18 L.Ed.2d 930 (1967); *Johnson v. United States,* 333 U.S. 10, 13–15, 68 S.Ct. 367, 368, 92 L.Ed. 436 (1948). The warrant procedure is designed to interpose the judgment of probable cause by a detached neutral judicial officer between the citizen and the police. By requiring that the decision of probable cause to search be made by a neutral judicial officer prior to the search, the citizen is protected from the hurried decision made by someone engaged "in the often competitive enterprise of ferreting out crime." *Johnson v. United States,* 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948). Because of the strong preference in favor of search warrants, there is a presumption that a warrantless search of private property is per se unreasonable, unless the search falls within one of the clearly delineated exceptions to the warrant requirement. *Coolidge v. New Hampshire,* 403 U.S. 443, 454–55, 91 S.Ct. 2022, 2031, 29 L.Ed.2d 564 (1971); *Mancusi v. DeForte,* 392 U.S. 364, 370, 88 S.Ct. 2120, 2124, 20 L.Ed.2d 1154 (1968); *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). The majority has made no attempt to conclude that the search of Ramapuram's property fell within one of the clearly delineated exceptions,[1]

---

1. The majority found that the automobile exception was inapplicable. Furthermore, the majority refused to find that exigent circumstances were present that justified a warrantless search.

and thus has not overcome the presumption that the warrantless search of Ramapuram's property was per se unreasonable.

Whether a search and seizure is actually unreasonable depends on the facts and circumstances of each case. *Cooper v. California*, 386 U.S. 58, 59, 87 S.Ct. 788, 789, 17 L.Ed.2d 730 (1967). The ultimate test of the reasonableness of a warrantless search, however, is whether property was searched in which the complainant had a reasonable expectation of privacy from governmental intrusion. *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). I strongly disagree with the majority's conclusion that Ramapuram had no reasonable or justifiable expectation of privacy in the trunk of the "junker" car found on the premises of the family's farm.[2]

The majority focuses on several factors that allegedly lessened Ramapuram's expectation of privacy. One such factor is that Ramapuram's car was found in an open field, an area seemingly outside the protection of the Fourth Amendment. In *Hester v. United States*, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924), the case in which the open field exception was recognized by the Supreme Court, revenue officers ventured on property belonging to Hester's father. While on the property, the officers observed Hester and an associate engaged in a transaction involving illegal liquor. The officers pursued Hester after the transaction, and during the pursuit, Hester dropped a jug of the illegal liquor on his father's premises, which broke the jug. The revenue officers examined the jug and its contents. Over Hester's objection, the Court upheld the inspection noting that the acts of Hester and his associates disclosed the jug and that there was no seizure when the officers examined the jug after it had been abandoned. *Id.* at 58, 44 S.Ct. at 446. The Court further commented that the protection of the Fourth Amendment does not extend to open fields. *Id.* at 59, 44 S.Ct. at 446. The application of *Hester* remains unclear. *Hester* has been cited frequently by the Supreme Court in support of the plain view doctrine. *See, e.g., Air Pollution Variance Board v. Western Alfalfa Corp.*, 416 U.S. 861, 865, 94 S.Ct. 2114, 2115, 40 L.Ed.2d 607 (1974) (smoke emitted from chimney seized); *Coolidge v. New Hampshire*, 403 U.S. 443, 465, 91 S.Ct. 2022, 2037, 29 L.Ed.2d 564 (1971); *Harris v. United States*, 390 U.S. 234, 236, 88 S.Ct. 992, 993, 19 L.Ed.2d 1067 (1968); *accord, McDowell v. United States*, 383 F.2d 599 (8th Cir. 1967) (identity of persons coming from field and samples of corn and millet seized). *Cf. United States v. Brown*, 487 F.2d 208 (4th Cir. 1973) (per curiam), *cert. denied*, 416 U.S. 909, 94 S.Ct. 1617, 40 L.Ed.2d 114 (1974) (ATF agents entered onto the defendant's premises and detected smell of fermentation. Such detection used to obtain search warrant, and detection upheld under open field doctrine); *accord, United States v. Williams*, 581 F.2d 451 (5th Cir. 1978), *cert. denied*, 440 U.S. 972, 99 S.Ct. 1537, 59 L.Ed.2d 789 (1979). The open field exception, however, has not been used by the courts as a license for a police officer to enter and search an object or effect in an open field, the contents of which are secluded from his view. *See, e. g., United States v. Brown*, 487 F.2d 208 (4th Cir. 1973) (per curiam), *cert. denied*, 416 U.S. 909, 94 S.Ct. 1617, 40 L.Ed.2d 114 (1974) (barn); *United States v. Williams*, 581 F.2d 451 (5th Cir. 1978) (shed), *cert. denied*, 440 U.S. 972, 99 S.Ct. 1537, 59 L.Ed.2d 789 (1979). *But see United States v. Basile*, 569 F.2d 1053 (9th Cir.), *cert. denied*, 436 U.S. 920, 98 S.Ct. 2268, 56 L.Ed.2d 761 (1978) (officer allowed to peer into window of immobile van). *Cf. United States v. Diaz–Segovia*, 457 F.Supp. 260, 270 (D.Md.1978) (officers may trespass on private property for surveillance as long as

---

2. Whether this case was decided on standing grounds or on the grounds that the search was unreasonable is unclear. As indicated by the majority opinion, the test in either situation is whether the complaining party had a reasona-

ble expectation of privacy. *See, e.g., Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

they do not search house or curtelage or peer into enclosed buildings or vehicles). In light of other courts' interpretations of *Hester*, a visual search of the exterior of the car and other parts in plain view to an officer in the field should be distinguished from a search of the enclosed trunk. The former may be searched without a warrant, whereas the latter should not be.

Since *Hester*, moreover, the Supreme Court has turned its focus in search and seizure cases away from the concept of constitutionally protected and unprotected places. *See Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967). Instead, the Court has directed its attention to persons and to what they seek to preserve as private. *Id.* Thus, in light of *Katz*, the validity of a blanket exclusion of an open field from Fourth Amendment protection is, at best, questionable. *See Wattenburg v. United States*, 388 F.2d 853 (9th Cir. 1968). *Cf. United States v. Minton*, 488 F.2d 37 (4th Cir. 1973) (per curiam), *cert. denied*, 416 U.S. 936, 94 S.Ct. 1936, 40 L.Ed.2d 287 (1974) (focus on reasonable expectation of privacy in search and seizure cases is more important than real property concepts); *accord, Patler v. Slayton*, 353 F.Supp. 376 (E.D.Va.1973), *aff'd*, 503 F.2d 472 (4th Cir. 1974).

The Supreme Court in *Katz* distinguished that which a person knowingly exposes to the public from that which a person seeks to preserve as private, even in an area accessible to the public. The former is not subject to Fourth Amendment protection from unreasonable search and seizure, whereas the latter may be protected. 389 U.S. at 351, 88 S.Ct. at 511. Clearly, as even the majority recognizes, Ramapuram sought to keep private any item placed in the trunk of the "junker" located on his family's property.

I cannot see how Ramapuram's reasonable expectation of privacy was diminished by parking his junker car in an area on his family's private farm. The rural character of the area should have some bearing on Ramapuram's expectation of privacy. Un-

like an urban dweller, whose activities and effects are more likely to be viewed by the casual passerby, the rural dweller reasonably can expect more privacy concerning his activities and his effects if his premises are far removed from the public road. *See United States v. Holmes*, 521 F.2d 859, 870 (5th Cir. 1975), *on rehearing*, 537 F.2d 227 (5th Cir. 1976). In order to reach the junker the agents had to proceed down a farm road[3] and across the Ramapuram property for a considerable distance from the public road. Ramapuram clearly did not knowingly expose his junker car to the public when the car was left on the premises of his farm at a distance of between 150 to 200 feet from the main road. Ramapuram's placement of the car is not comparable to the placing of a jacket on a coat rack in a general work area visible to any casual passerby, *United States v. Alewelt*, 532 F.2d 1165 (7th Cir.), *cert. denied*, 429 U.S. 840, 97 S.Ct. 114, 50 L.Ed.2d 109 (1976), or to leaving a car parked along a public road. *United States v. Newbourn*, 600 F.2d 452 (4th Cir. 1979). Furthermore, Ramapuram had a property interest in the farm by virtue of his family's ownership of the premises. Although ownership alone may be insufficient to establish a reasonable expectation of privacy, it is nevertheless a relevant inquiry, *United States v. Dall*, 608 F.2d 910, 914 (1st Cir. 1979), *cert. denied*, 445 U.S. 918, 100 S.Ct. 1280, 63 L.Ed.2d 603 (1980), and promotes a more reasonable expectation of privacy than that of someone who has no possessory or property interest in the searched property, *United States v. Jackson*, 585 F.2d 653 (4th Cir. 1978) (no reasonable expectation of privacy in property stored in a vacant house in which the defendant had no possessory or property interest).

A second factor that the majority considers as diminishing Ramapuram's expectation of privacy is that the item searched was a car. Yet, the majority at all times refers to Ramapuram's vehicle not as a car but as another effect, a "junker." Thus, the majority does not and indeed cannot

---

**3.** The testimony in the record conflicts on whether the farm road was public or private.

justify its decision by treating the "junker" as a car falling within the automobile exception to the search warrant. The problem that remains, therefore, is that the majority has not adopted any other justification for the warrantless search. Furthermore, even though there may be a lesser expectation of privacy in a car than in a dwelling, *see South Dakota v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976), the degree of such lesser expectation is not clear. This court has spoken of the lesser expectation of privacy in an automobile in terms of the motorist operating his vehicle on public streets and highways. *United States v. Newbourn*, 600 F.2d 452 (4th Cir. 1979). Clearly, this is not such a situation. Certainly, a car, as an effect, is afforded some Fourth Amendment protection from unreasonable searches and seizures. *See, e.g., United States v. Chadwick*, 433 U.S. 1, 12, 97 S.Ct. 2476, 2484, 53 L.Ed.2d 538 (1977); *Cady v. Dombrowski*, 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973). Moreover, there is some indication that there may be a more reasonable expectation of privacy in the interior and trunk of the car than there is in the exterior parts. *See, e.g., Cardwell v. Lewis*, 417 U.S. 583, 591, 94 S.Ct. 2464, 2469, 41 L.Ed.2d 325 (1971) (authorizing warrantless examination of exterior of car while noting that there may be some interior parts of the car subject to Fourth Amendment protection); *United States v. Holmes*, 521 F.2d 859 (5th Cir. 1975) (dicta), *on rehearing*, 537 F.2d 227 (5th Cir. 1976) (person may complain if police without probable cause or the existence of exigent circumstances break into his car and seize objects hidden in the trunk or glove compartment); *United States v. Brown*, 457 F.2d 731 (1st Cir. 1972), *cert. denied*, 409 U.S. 843, 93 S.Ct. 42, 34 L.Ed.2d 82 (1973). Even if there is a lesser expectation of privacy in an automobile than in a dwelling, such lesser expectation without other compelling circumstances does not authorize a warrantless search of Ramapuram's trunk parked on his private property. *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

In addition to relying on the open field exception and the characterization of the item searched as a car as diminishing Ramapuram's expectation of privacy, the majority considers other lessening factors. The majority focuses on the absence of a lock on the trunk of Ramapuram's car. A repository of personal belongings is not outside the protection of the Fourth Amendment merely because it does not have a lock to secure it. *See Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979) (warrantless search of unlocked suitcase in trunk of taxicab unreasonable). *Cf. United States v. Bradshaw*, 490 F.2d 1097 (4th Cir.), *cert. denied*, 419 U.S. 895, 95 S.Ct. 173, 42 L.Ed.2d 139 (1974) (unreasonable search to peer through space between the edges of truck doors that did not fit together properly). There may be less need for a lock to protect effects on private property than in a public airport or in the back of a taxicab. It is not persuasive, moreover, that Ramapuram did not reside permanently on the premises searched since the district court concluded that Ramapuram used the farm frequently although the premises were leased to others. Although such factors may have lessened Ramapuram's expectation of privacy, I am not persuaded that such factors viewed together extinguished any reasonable expectation of privacy that Ramapuram had in the trunk of his "junker" parked on his family's farm.

Furthermore, I cannot ignore, as the majority appears to have done, the strong presumption that a warrantless search of personal property is per se unreasonable. *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). I am not convinced that there was sufficient reason to dispense with a warrant in this case. The facts in this case are analogous to those in *United States v. Bradshaw*, 490 F.2d 1097 (4th Cir.), *cert. denied*, 419 U.S. 895, 95 S.Ct. 173, 42 L.Ed.2d 139 (1974). In *Bradshaw*, an Alcohol, Tobacco and Firearms agent and two state police officers, suspecting the defendant of distilling liquor, proceeded to the vicinity of the defendant's residence to search for a still in the fields adjacent to the defendant's property. While searching

the adjacent fields, the officers detected the smell of whiskey emanating from a seemingly abandoned vehicle located beyond the boundaries of the defendant's property beside an access road leading to defendant's residence. The officers and agent went to defendant's residence to ask him if he knew anything about the abandoned vehicle. When the defendant failed to answer the front door, the agent decided to try the back door. En route to the rear of the house, the agent discovered a 1952 truck parked near the house. The truck had sideboards and swinging rear doors so that the casual glance of a passerby would not have discovered whatever may have been resting on the bed of the truck. When the agent detected the smell of whiskey coming from the truck, he peered through a crack in the doors at the rear of the truck and saw a large number of jugs containing white liquid. The agent entered the truck without a warrant, ascertained that the jugs contained moonshine and seized the jugs. The court held that because the objects on the bed of the truck could not be viewed except by someone who took special pains to peer through the crack and because the truck was on the defendant's premises near his residence, the defendant had a reasonable expectation of privacy in the contents of the truck bed. The court further emphasized that defendant's expectation of privacy with respect to the contents of the truck was enhanced because the vehicle was parked on the defendant's property. *Id.* at 1103. Similarly, Ramapuram's junker was on his private rural property and the contents of the trunk were not visible to the casual passerby. The court in *Bradshaw* noted that there were no circumstances that would work to dispense with the necessity of obtaining a warrant prior to searching the truck. The court concluded that two agents could have guarded the truck while the third obtained a warrant. Similarly in Ramapuram's situation, there was no need to dispense with obtaining a warrant prior to searching Ramapuram's trunk. As in *Bradshaw*, there were a sufficient number of agents to stand guard while the others went to obtain a warrant. The car

was in the exclusive control of the agents, *see United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977); *United States v. Johnson*, 588 F.2d 147 (5th Cir. 1979), and there were no exigent circumstances supporting the need for an immediate search or seizure.

In light both of the strong presumption in favor of search warrants and of the lack of circumstances which would mandate dispensing with a warrant, I conclude that the search and seizure of Ramapuram's property was unreasonable. The evidence obtained as a result of the search, therefore, should have been suppressed.